IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | SEALED |
| | § | |
| V. | § | Case No. 4:17-cr- *213* |
| | § | Judge *Crone* |
| THURMAN P. BRYANT, III, a/k/a | § | |
| TREY BRYANT (01), and | § | |
| ARTHUR FRANZ WAMMEL (02) | § | |

FILED

DEC 1 3 2017

Clerk, U.S. District Court
Texas Eastern

THE UNITED STATES GRAND JURY CHARGES:

## COUNT ONE

> Violation: 18 U.S.C. § 1349, §
> 1343 (Conspiracy to commit
> wire fraud)

**A.    Introduction**

At all times material to the facts set forth in this Indictment:

1.    **Thurman P. Bryant, III** a/k/a Trey Bryant ("**Bryant**") was an

individual residing in the City of Frisco, Collin County, Texas, in the Eastern

District of Texas.

2.    **Arthur Franz Wammel** ("**Wammel**") was an individual residing in

the City of Kemah, Texas.

1

3.      Bryant United Capital Funding, Inc. ("BUCF") was a business organization.  **Bryant** was the Chairman, CEO and President of BUCF.

4.      Wammel Group, LLC. ("Wammel Group") was a business organization.  **Wammel** was the Managing Member of Wammel Group, LLC.

5.      Wells Fargo Bank was a financial institution and was insured by the Federal Deposit Insurance Corporation.

**B.      The Scheme to Defraud**

6.      From on or about February 15, 2011, and continuing up to the date of February 2, 2017, in the Eastern District of Texas and elsewhere, the Defendants, **Bryant** and **Wammel**, together agreed to commit wire fraud, each defendant knowing the unlawful purpose of the agreement, and each defendant joining the agreement with the intent to further the unlawful agreement.  Having entered into this conspiracy and agreement, the defendants knowingly devised and intended to devise a scheme and artifice to defraud, the scheme employing false material representations, pretenses, and promises, and for the purpose of executing the scheme and artifice, and attempting to do so, transmitted and caused to be transmitted by way of wire communication in interstate commerce writings, signs, signals, pictures, and sounds, and did so with specific intent to defraud, all in violation of 18 U.S.C. § 1349 and 1343.

**C.      Manner and Means**

It was part of the scheme and artifice that:

2

7.    **Wammel** maintained a bank account at Wells Fargo Bank in the name of Wammel Group, LLC, bearing account number XXXXXX9950.  On or about July 12, 2011, **Bryant** opened a bank account at Wells Fargo Bank in the name of Bryant United Capital Funding, Inc., bearing the account number XXXXXX9692.  The defendants controlled, used, and maintained these accounts to further their unlawful scheme, to receive and deposit funds from individuals who thought they were investing in legitimate investments, to exchange and transfer the funds between the accounts.

8.    **Wammel** knew that **Bryant** resided in and conducted activities related to the BUCF investment recruitment and scheme in Collin County, in the Eastern District of Texas:  on or about February 13 and February 14, 2013, **Wammel** provided false statements of employment, earnings, and investments at **Bryant's** request to a realty company in order for **Bryant** to lease a home in Frisco, Texas, in the Eastern District of Texas.

9.    Beginning in or about October 2008, **Wammel** solicited money from individuals living in and around the area of Houston, Texas, representing that he was investing funds in an Options Express trading account and day-trading stock market options. On or about May 26, 2010, **Bryant** wire transferred approximately $200,000 to Wammel to invest in the Options Express account.  This money was provided to **Bryant** by an individual in Houston who believed that **Bryant** was going to invest it in high-end vehicles; the individual changed his mind and requested his money back but **Bryant** never returned it, instead sending it to

**Wammel**. **Wammel** received the $200,000 from Bryant in the Wammel Group, LLC Wells Fargo account number XXXXXX9950.

10.     In general, **Wammel** deposited and comingled the Options Express investor funds in the Wammel Group, LLC, Wells Fargo account number XXXXXX9950, the same account to which **Bryant** would later wire transfer or deposit funds that Bryant received from BUCF "investors" as described below. **Wammel** generally invested the funds that he received in an Options Express trading account and engaged in day-trading, but frequently lost money.  **Wammel** sent monthly statements to the individuals who had transferred funds to him to be placed in the Options Express fund, but falsely represented and stated in those statements the current account balance as well as the current monthly rate of return.  As of on or about February 2017, **Wammel** had taken in approximately $22,227,560 from individuals who thought they were investing, but **Wammel** only retained $2,307,728 in the Options Express account, which was the ultimate destination of the investor funds for both Wammel and Bryant's investors.  All told, the investors in the Options Express scheme lost a combined total of approximately $19,919,832.

11.     Beginning in or about February 17, 2011, **Bryant**, with **Wammel's** knowledge, solicited money from individuals, supposedly to be invested by **Bryant** in a real estate-related fund.  These solicitations were made in person, by email, and by use of other wire transmissions in interstate commerce.  As a part of these solicitations, **Bryant**, with **Wammel's** knowledge, made multiple false

statements, representations, and promises to potential BUCF "investors" in writing, verbally, and in BUCF partnership "investment" agreements, including that: "investments" would result in guaranteed returns totaling between 30% and 42% per year on their funds; there was no risk to the individual's initial principal "investment;" the funds would be maintained in separate capital accounts or escrow accounts; and that the "capital account" would be maintained in accordance with Treasury Regulations. Once an individual agreed to invest in BUCF, the investor and Bryant would sign an investor partnership agreement.

12.    After **Bryant** received money from the victims, instead of depositing the funds in a separate capital account as he had represented, stated, and promised would occur, he kept a significant portion of the money for his own personal uses and wire-transferred or direct transferred the balance from the BUCF Wells Fargo account number XXXXXX9692, to the Wammel Group, LLC, Wells Fargo account number XXXXXX9950. The BUCF funds were commingled in that **Wammel** Group account with funds that other individuals has provided to **Bryant** to invest in BUCF, as well as funds that **Wammel** had received from individuals who thought they were investing in Wammel Group, LLC's Options Express trading fund. All told, **Bryant** received approximately $22,471,088 from individuals to whom he had made the material false representations, pretenses, and promises related to BUCF and the real estate "investment" scheme. Of this amount, **Bryant** skimmed approximately $6,341,144 off of the funds before

transmitting the balance to the Wammel Group, LLC Wells Fargo bank account controlled by **Wammel**.

13.    Each month, **Bryant** communicated with **Wammel** by interstate wire communication or by phone and requested that **Wammel** transfer to the BUCF Wells Fargo account funds that were to be paid to the individuals who had provided money to invest in BUCF as their monthly return on principal. In response, **Wammel** would cause wire transfers or direct payments to be made from the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950, to the BUCF Wells Fargo Bank account number XXXXXX9692, of the amounts that **Bryant** had requested. Further, each month **Wammel** would withdraw and keep a sum from the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950 equal to approximately 1% of the "balance" of the net BUCF funds that were remaining in the Wammel Group, LLC account. Each month **Bryant** would also receive from **Wammel** a transfer of approximately 1% of the "balance" of the net BUCF funds that were remaining in the Wammel Group, LLC account.

14.    After Bryant received the monthly transfers from **Wammel**, **Bryant** distributed the funds by wire transfers to the individuals who had provided money to Bryant to invest in BUCF in amounts that were equivalent to the returns that he had promised and represented to the individuals prior to receiving their money. In fact, these distributions were not returns on investment or interest, but were the principal funds that **Bryant** was simply returning to the individuals who had

6

transferred or provided money to **Bryant** to invest in BUCF. **Bryant** transmitted and sent monthly statements to the individuals who had transferred or provided funds to **Bryant** when he transferred the monthly payments to them. These monthly statements included false material representations, statements, and pretenses, including: descriptions of the purported escrow capital balance, available disbursement, qualified referral bonus, payment date, calculated account balance, rate of return, guaranteed monthly earnings, and a bar chart indicating balance, annual earnings, monthly earnings. The individuals received these statements from **Bryant** and were deceived by **Bryant** into believing that their funds were still held intact and secure, and that they were earning significant returns on their funds, when neither of these was the case, and they were therefore lulled into believing that BUCF was a legitimate investment fund and into maintaining their funds with BUCF (although most of the funds were spent by **Bryant** and **Wammel**). As of on or about March 31, 2017, **Bryant** had taken in approximately $22,471,088 in funds from more than approximately 100 individuals, but **Wammel** only retained $1,578,440 in the Options Express account, which was the ultimate destination of the funds for both **Wammel** and **Bryant's** "investors." As a result, through their fraudulent scheme and artifice, **Bryant** and **Wammel** caused the individuals who provided money to **Bryant** with the understanding that he would invest in what they thought was a secure, no-risk investment, to lose a combined total of approximately $20,892,648.

15.     **Bryant** and **Wammel** were personally enriched by the scheme and artifice.  **Bryant** personally took and spent approximately $5,901,056 in BUCF investor funds, which he and his family spent in extravagant ways, including: payments for a home that he owned in Richmond, Texas, along with related expenses; payment of over approximately $600,000 to lease a residence in Frisco, Texas, in the Eastern District of Texas; payments of over $1 million for improvements to that residence; vehicle down payments and lease payments; retail purchases, dining, and medical expenses; credit card payments; and cash withdrawals.   **Wammel** likewise took and used for personal purposes both the Options Express investor funds and the 1% monthly payment of the BUCF investments sitting in the Wammel Group, LLC account, and used these funds to finance and purchase multiple residences, a private airplane, luxury vehicles, other investments, and retail purchases.

**D.     The Execution of the Scheme and Artifice**

**The Execution of the Fraud Scheme Against SBH and SAH**

16.     In or about May 8, 2015, **Bryant** began communicating with SBH, an individual known to the Grand Jury, soliciting money from SBH to "invest" in BUCF.  During the course of their communications, **Bryant** met personally with SBH in the City of Frisco, Texas, in the Eastern District of Texas, to market his investment scheme to SBH.  As he was seeking money from SBH, **Bryant** falsely stated and represented to SBH that:  BUCF ran a business processing thousands of mortgage applications per month and was paid $500.00 - $600.00 for each

application; BUCF "investment" funds were held in a secure escrow account with no risk; a hedge fund, which BUCF has a business relationship with, required the secured investor capital as collateral for a line of credit the hedge fund made available to BUCF; all investor money was deposited into a risk-free "secure escrow account" which was controlled and managed by **Bryant** and BUCF; the investment funds were only utilized as collateral, and were not actively invested; SH was guaranteed a 30% annual return on investment (i.e.,  2.5% of his total investment on a monthly basis); BUCF had $8 million on reserve; and if and/or when he requested his principal back, BUCF would provide his entire initial principal within sixty days of the refund request.  **Bryant** concealed the existence of and did not tell SBH about the fact that Wammel Group, LLC, or the transfer of funds to the Wammel Group, LLC Wells Fargo bank account that **Wammel** controlled.

17.     On or about June 23, 2015, in furtherance of the scheme, **Bryant** caused an interstate transmission of email with subject line "RE: FW: F_____ O_____ referral" to be sent from Bryant's email account, which was hosted by GoDaddy.com in Scottsdale, Arizona, to the email account for SBH, which was hosted in Richardson, Texas.  Within this email, **Bryant** falsely stated and represented that: none of the funds were "used" but were instead only to back a "warehouse line;" the "secure escrow account" was in a "tesa protected account" with a financial institution; the investments were maintained separately "for asset protection."

18.     On or about August 18, 2016, in furtherance of the scheme, **Bryant** caused an interstate transmission of email with subject line "RE: F_____ O_____ referral" to be sent from **Bryant's** email account, which was hosted by GoDaddy.com in Scottsdale, Arizona, to the email account for SBH, which was hosted in Richardson, Texas.  Within this email, **Bryant** represented and stated that BUCF was still accepting investors and that he would have the contract and paperwork prepared, and requested the full names of the investors.

19.     After receiving and based on **Bryant's** representations, pretenses, and statements, SBH and his wife SAH, also an individual known to the Grand Jury, made the decision to invest $180,000 in BUCF, and signed a BUCF partnership agreement.  On or about September 6, 2016, SH and his wife SAH, at the request of and with the knowledge of **Bryant**, caused an interstate wire transfer in the amount of $180,000 to be sent from their account held at Charles Schwab and Company, San Francisco, California, to the BUCF Wells Fargo Bank account number XXXXXX9692 for the investment.

20.     On or about September 9, 2016, **Bryant** caused a cashier's check in the amount of $615,000—which included the $180,000 investment by SBH and SAH—to be drawn from the BUCF  Wells Fargo Bank account number XXXXXX9692, and deposited into the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950.

21.     On or about November 1, 2016, in furtherance of the scheme, **Wammel** caused an interstate transmission of email with subject line "Dep" to be

sent from **Wammel's** email account, which was hosted by Google, Inc., in Mountainview, California, to **Bryant's** email account, which was hosted by GoDaddy.com in Scottsdale, Arizona. Within this email, **Wammel** stated to **Bryant** that he would make a deposit at "WF" (Wells Fargo) the next day. On or about November 2, 2016, after sending the email to **Bryant**, in furtherance of the scheme **Wammel** caused a wire transfer in the amount of $517,605 to be sent from the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950 to the BUCF Wells Fargo Bank account number XXXXXX9692.

22.    On or about November 3, 2016, in furtherance of the scheme **Bryant** caused an interstate wire transfer in the amount of $4,500 to be sent from the BUCF Wells Fargo Bank account number XXXXXX9692 to SBH's and SAH's bank account at Bank of America account number XXXXX6000, in Henrico, Virginia, as a payment of purported return on investment.

23.    On or about February 24, 2017, in furtherance of the scheme **Bryant** caused an interstate transmission of email with subject line "2016 Tax Statement/Bryant United Capital Funding" to be sent from **Bryant's** email account, which was hosted by GoDaddy.com in Scottsdale, Arizona, to SBH's email account, which was hosted in Richardson, Texas. Within this email, **Bryant** stated "As always, we appreciate each member of our equity group." Attached to the email was a 2016 interest income tax statement for SBH, falsely representing that BUFC was a legitimate investment plan and fund and lulling SBH into

11

believing that BUCF was a legitimate investment fund and into leaving his funds with BUCF.

24.    All told, SBH and SAH transferred approximately $180,000 to **Bryant** to invest in BUCF.  In the end, SBH and SAH suffered a net loss of approximately $153,000 as a result of **Bryant's** and **Wammel's** fraud scheme.

## The Execution of the Fraud Scheme Against GW and AW

25.    In or about 2015, **Bryant** began communicating with individuals GW and AW, both individuals known to the Grand Jury, soliciting money from them related to the BUCF scheme.  During the course of their communications, **Bryant** met personally with GW and AW in the City of Frisco, Texas, in the Eastern District of Texas, to market his investment scheme to GW and AW.  As he was seeking money from GW, **Bryant** falsely stated and represented to GW that: **Bryant** ran a business which employed 2,000 people; BUCF investment funds were held in a secure escrow account with no risk; the funds were used as capital as collateral to back a "warehouse line" of credit  made available to BUCF; all investor money was deposited into a risk-free "secure escrow account"; the investment funds were only utilized as collateral; GW and AW were guaranteed a 42% annual return on investment (i.e.,  3.5% of their total investment on a monthly basis) with their initial principal intact; and that if and/or when he requested his principal back, BUCF would provide his entire initial principal within sixty days of the refund request.  **Bryant** concealed the existence of and did not tell GW and AW about Wammel Group, LLC, or the transfer of funds to the

Wammel Group, LLC Wells Fargo bank account that **Wammel** controlled.

26.    After receiving and based on **Bryant's** representations, pretenses, and statements, GW and his wife AW made the decision to provide money to **Bryant** to invest in BUCF.  On or about July 6, 2015, GW drafted a personal check in the amount of $50,000, drawn on the J.P. Morgan Chase Bank, N.A. account for GW and AW, account number XXXXX3482, and forwarded it to **Bryant** to invest in BUCF.  On or about July 7, 2015, **Bryant** caused this check to be deposited into the BUCF Wells Fargo Bank account number XXXXXX9692.

27.    On or about July 8, 2015, after receiving and depositing the GW and AW funds above, **Bryant** caused a direct payment in the amount of $250,000— which included the $50,000 from GW and AW—to be sent from the BUCF Wells Fargo Bank account number XXXXXX9692, to the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950.

28.    On or about September 1, 2015, **Wammel** caused a direct payment in the amount of $250,000 to be sent from the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950 to  the BUCF Wells Fargo Bank account number XXXXXX9692, in order to pay out returns to the individuals who provided money to **Bryant** for what they thought was an investment in BUCF.

29.    On or about September 2, 2015, in furtherance of the scheme, **Bryant** caused an interstate wire transfer in the amount of $1,750 to be sent from the BUCF Wells Fargo Bank account number XXXXXX9692 to GW's and AW's bank account at J.P. Morgan Chase Bank, N.A. account number XXXXX3482, in

Tampa, Florida, as a purported payment of return on investment.

30.     On or about March 2, 2017, in furtherance of the scheme, **Bryant** caused an interstate transmission of email with subject line "Feb 2017 Earnings Statement / Bryant United Capital Funding" to be sent from **Bryant's** email account, which was hosted by GoDaddy.com in Scottsdale, Arizona, to GW's email account, which was hosted by Vorbi, in Dallas, Texas. Within this email, **Bryant** represented that he was providing an attachment with a month-end earnings statement and that batches of payments would be deposited beginning on March 3, 2017 and continuing thereafter, and attached a "temporary month-end statement" falsely describing "equity balance" and scheduled payout amounts for the account, thereby lulling GW and AW into believing that BUCF was a legitimate investment fund and causing them to leave their funds with BUCF.

31.     All told, GW and AW transferred approximately $200,000 to **Bryant** to invest in BUCF. In the end, GW and AW suffered a net loss of approximately $130,000 because of **Bryant's** and **Wammel's** fraud scheme.

### The Execution of the Fraud Scheme Against PL

32.     In or about 2011, **Bryant** began communicating with PL, an individual known to the grand jury, soliciting money from PL for what Bryant described as an investment in BUCF. As he was seeking investment from PL, **Bryant** falsely stated and represented to PL that: BUCF ran a business processing 10,000 mortgage applications per month; BUCF investment funds were held in a secure escrow account with no risk; the funds were used as collateral to back a

14

"warehouse line" of credit the firm made available to BUCF; all investor money was deposited into a risk-free "secure escrow account" which is controlled and managed by **Bryant** and BUCF; the investment funds were only utilized as collateral, and were not actively invested; PL was guaranteed a 30% annual return on investment (i.e., 2.5% of his total investment on a monthly basis) with his initial principal intact; and that if and/or when he requested his principal back, BUCF would provide his entire initial principal within sixty days of the refund request. **Bryant** concealed the existence of and did not tell PL about Wammel Group, LLC, or the transfer of funds to the Wammel Group, LLC Wells Fargo bank account that **Wammel** controlled. In response to **Bryant's** representations, statements, and promises, PL began providing money to **Bryant** for what PL understood was an investment in BUCF in or about July 2012. Later, PL also asked **Bryant** about opportunities to invest funds that PL maintained in a trust, and funds that PL's parents had, and **Bryant** accepted these funds also.

33.     On or about April 26, 2013, in furtherance of the scheme, **Bryant** caused an interstate transmission of an email with subject line "RE: Hello from Washington" to be sent from **Bryant's** email account, which was hosted by GoDaddy.com in Scottsdale, Arizona, to PL's email account, which was hosted in California. Within the email, **Bryant** represented and stated that he could set up an account based on investment from a trust, that they would need to have documentation, and that it would function in the same way as prior investments in BUCF that PL had made, and that PL could increase his capital account

investment at any time.

34.    On or about June 6, 2013, at **Bryant's** request and with his knowledge, PL caused a interstate wire transfer in the amount of $80,000 to be sent from Citibank N.A, New York, to a Wells Fargo Bank account for **Bryant** United Capital Funding, Inc, account number XXXXXX9692, for what PL understood from Bryant was an investment in BUCF.

35.    On or about June 11, 2013, **Bryant** caused a direct payment of the received PL funds in the amount of $80,000 to be sent from the BUCF Wells Fargo Bank account number XXXXXX9692, to the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950.

36.    On or about July 31, 2013, **Wammel** caused a direct payment in the amount of $163,882 to be sent from the Wammel Group, LLC Wells Fargo Bank account number XXXXXX9950 to the BUCF Wells Fargo Bank account number XXXXXX9692.

37.    On or about July 29, 2013, in furtherance of the scheme, **Bryant** caused an interstate transmission of email with subject line "July 2013 Earnings Statement/Bryant United Capital Funding" to be sent from Bryant's email account, which was hosted by GoDaddy.com in Scottsdale, Arizona, to PL's email account, which was hosted in the State of Washington.  Within this email, **Bryant** congratulated and thanked PL for "another great month with Bryant United Capital Funding."  **Bryant** attached two July 2013 BUCF "investor" statements to the email, and these statements included false statements and representations about

the balance of funds in the account as well as the returns on funds invested by PL. By making these false statements and representations, **Bryant** lulled PL into believing that BUCF was a legitimate investment fund and into taking no action related to the funds that PL had transferred to **Bryant**.

38. On or about August 28, 2013, in furtherance of the scheme, **Bryant** caused an interstate transmission of email with subject line "RE: Another Investor?" to be sent from Bryant's email account , which was hosted by GoDaddy.com in Scottsdale, Arizona, to PL's email account, which was hosted in Washington. Within this email, **Bryant** encouraged and recruited PL to make further payments into the BUCF fund, stating and representing that the BUCF investment group was still accepting investors and that Bryant would "love" to have PL's parents as investors to take advantage of investment returns "throughout their retirement."

39. On or about September 5, 2013, in furtherance of the scheme **Bryant** caused an interstate wire transfer in the amount of $2,000 to be sent from the BUCF Wells Fargo Bank account number XXXXXX9692 to PL's bank account at Citibank N.A, New York, as purported return on the PL funds.

40. All told, PL transferred approximately $397,000 to **Bryant** for what PL understood from Bryant was an investment in BUCF. In the end, PL suffered a net loss of approximately $92,750 as a result of **Bryant's** and **Wammel's** fraud scheme.

All in violation of 18 U.S.C. § 1349.

17

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

Pursuant to 18 U.S.C. §§ 981(a)(1)(c) and 28 U.S.C. § 2461

As the result of committing the foregoing offense alleged in this indictment, the defendants herein shall forfeit to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(c) and 28 U.S.C. § 2461:

1.    any property constituting, or derived from, and proceeds the defendants obtained, directly or indirectly, as the result of such violations; and

2.    any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violations, including, but not limited to the following:

### Cash Proceeds

$20,892,648 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the foregoing offenses alleged in this indictment.

### Substitute Assets

If any of the property described above as being subject to forfeiture, as a result of any act or omission of one or both of the defendants -

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited

with a third person;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot

be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. §

853(p), to seek forfeiture of any other property of the defendants

up to the value of the above forfeitable property, including but

not limited to all property, both real and personal owned by the

defendants.

By virtue of the commission of the offenses alleged in this indictment, any and

all interest the defendants have, jointly or separately, in the above-described

property is vested in the United States and hereby forfeited to the United States

pursuant to pursuant to 18 U.S.C. §§ 981(a)(1)(c) and 28 U.S.C. § 2461.

A TRUE BILL

_____          _____12|13|17_____

GRAND JURY FOREPERSON          Date

BRIT FEATHERSTON
ACTING UNITED STATES ATTORNEY

12/13/2017

BY:  THOMAS E. GIBSON          Date
Assistant United States Attorney

G.R. JACKSON
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | SEALED |
| | § | |
| V. | § | Case No. 4:17-cr-_____ |
| | § | Judge _____ |
| THUMAN P. BRYANT III, a/k/a | § | |
| TREY BRYANT (01), and | § | |
| ARTHUR FRANZ WAMMEL (02) | § | |

## NOTICE OF PENALTY

### COUNT ONE

Violation:               18 U.S.C. §§ 1349, 1343 (Conspiracy to
                         commit wire fraud)

Penalty:                 Imprisonment for a term not more than 20
                         years, a fine not to exceed $250,000.00, or
                         both.   A term of supervised release of not
                         more than three years in addition to such term
                         of imprisonment.

Special Assessment:      $100.00